## SHELL OIL CO. v. HUNT.
### No. 2343.

Circuit Court of Appeals, Tenth Circuit.

Dec. 15, 1941.

Grant H. Bagley, of Salt Lake City, Utah (P. T. Farnsworth, Jr., and W. Q. Van Cott, both of Salt Lake City, Utah, on the brief), for appellant.

Shirley P. Jones, of Salt Lake City, Utah (Knox Patterson, of Salt Lake City, Utah, on the brief), for appellee.

Before PHILLIPS, BRATTON, and HUXMAN, Circuit Judges.

HUXMAN, Circuit Judge.

On June 1, 1933, Moroni Hunt and Angus E. Johnson leased a tract of ground, on which they were operating a filling station, to the Shell Oil Company for a period of three years. As a rental therefor, Shell agreed to pay them one cent for each gallon of gasoline delivered by Shell to the leased premises and sold therefrom during the term of the lease. On the same day and as a part of the same transaction, a second agreement was executed by the parties in which Shell subleased the premises back to Hunt and Johnson. In substance this agreement provided that Hunt and Johnson were to operate the station as agents and to sell on consignment only Shell products. They could not sublet or assign the premises without the written consent of Shell. Shell was to maintain at all times on consignment sufficient of its products to satisfy the needs of the station. This contract contained the usual provisions found in a consignment contract, such as the price at which the products were to be sold, the care thereof, accounting for the proceeds from sales, and the compensation of the agents. Johnson had been and was at the time of the execution of the contract employed by Shell as a selling and distributing representative in several adjoining counties. Immediately after the execution of the contract it was agreed between Hunt and Johnson that Hunt would continue to operate the station and use the proceeds accruing to them to pay the balance due on the purchase price of the station, and thereafter pay Johnson $25 per month rental for his one-half interest in the premises. Hunt continued to operate the station and sold Shell products. In the latter part of 1936 or the first part of 1937 he ascertained that he was not receiving credit for the rental of one cent per gallon from Shell. He thereupon instituted an action to recover the amount he claimed due him. Shell's defense to that action was that the assignment by Johnson of his interest in the contract to Hunt breached the covenant against assignment; that the contract was thereby terminated; and that the parties had never operated under the contract and that there was no

rent due. The trial court adopted Shell's theory, dismissed the action, and entered judgment for Shell. Hunt appealed to this court. We reversed (Hunt v. Shell Oil Co. et al., 10 Cir., 116 F.2d 598), holding that the contract was in force, and sent the case back for trial upon the issues. Upon retrial, judgment was entered for Hunt for $5,187.67 and for costs. Shell has appealed.

Appellant now contends that the rental was paid on 153,931 gallons by deducting one cent from the price charged Hunt for the gasoline. To establish this, Shell introduced in evidence an invoice delivered to Hunt, which bears the following notations:

"Authorized Re- Less Contract    Net
  tail Price    Adjustment     Price
     23            4            19"

Shell argues that the four cents includes the one cent rental and three cents commission. To establish this, Shell offered the testimony of Johnson, who was the partner of Hunt and the employee of Shell. His testimony lacks candor and frankness. On cross examination he was asked: "Q. If they weren't paying rent did you deduct one cent from them, or did this defendant get exactly the same price that they got when you were paying him a rent of one cent a gallon? If he should have got one cent more if they were not paying rent? How about that? A. I would like to confer with Mr. Bagley on that. The Court: I won't let you do that."

From the invoice exhibit and Johnson's testimony, the inference that the four cents was his regular commission is more reasonable than that his commission was three cents and the other cent was rent under the rental contract. At the first trial Shell denied that there was any rent due Hunt. It said, "We never operated under the contract and therefore Hunt is entitled to no rent." Being defeated in that contention, it now shifts its position and says, "We paid the rent we formerly said we did not owe." It would now have us believe it made a gratuitous payment of one cent per gallon as rent on 153,931 gallons when none was due as it once contended. The record falls far short of sustaining it in this inconsistent position.

It is next argued that the company waived its right to fix the resale price of gasoline sold subsequent to June 1, 1936, and that therefore in any event, no rent is due thereafter. The contract provided that

the company might from time to time by notice in writing waive its right to fix the resale price of gasoline. No written notice of waiver was ever given by the company. It appears that subsequent to June 1, 1936, Shell did not list the resale price of gasoline on the invoices. This, it now contends, constituted a waiver of its right under the contract and relieved it from its obligation to pay rent. Nowhere does it appear that Hunt ever sold gasoline other than at the regular retail price. This contention is without merit.

█ It is next argued that the contract was terminated by notice served on August 6, 1936. This contention, like the others, is more fanciful than real. It is conceded that no written notice of termination was ever given. On August 6, 1936, Shell prepared a new contract between it and Hunt and Johnson. The new contract specifically provided for the cancellation of all preceding contracts between the parties. Shell signed this contract and Johnson, its employee, signed it, "Johnson and Hunt, buyer, by Angus E. Johnson." Shell argues that this new contract terminated the old one. But Hunt did not sign the contract, and the signature of Johnson, who was no longer interested in the operation of the station with him, would not bind Hunt. Shell recognized this, because on April 21, 1937, it wrote Johnson pointing out the necessity of procuring Hunt's signature on the new contract. The letter stated: "Paragraph #7 of the DO-613, provides that upon proper execution, same shall constitute the entire agreement between Seller and Buyer and that same cancels and supersedes all prior agreements. Inasmuch as the DO-613 in question [which was the original contract] is not signed by both Messrs. Johnson & Hunt, it can not be considered as fully effecting cancellation of our lease dated 6/1/33." It therefore clearly appears that when Shell wrote this letter in 1937, it considered the original contract in force. Now it says it was canceled August 6, 1936. In the letter to Johnson in which Shell transmitted the new contract for Hunt's signature, it also enclosed a cancellation agreement for the cancellation of the first contract, with instructions to attempt to procure Hunt's signature thereon if Johnson failed to get his signature on the new contract. Why all this effort to procure an acknowledgment of cancellation from Hunt if Johnson's signature on the contract of August 6, 1936, canceled the prior contract? The answer is obvious. The first contract was in force and Shell recognized this fact.

█ And, finally, it is contended that the contract in any event was canceled when Hunt filed his suit. There is no evidence of any change in the relations between the parties after the filing of the suit. From all that appears in the record they continued in the same way as they had before. The petition asked for a cancellation of the contract and Shell's answer asked the court to cancel the contract, but it was not canceled until the court entered judgment of cancellation on March 10, 1940. We find no error in the record.

Affirmed.